# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| ANA SUDA and MARTHA HERNANDEZ,<br><br>              Plaintiffs,<br><br>vs.<br><br>UNITED STATES CUSTOMS AND BORDER PROTECTION; CBP ACTING COMMISSIONER MARK A. MORGAN, in his official capacity, and CBP AGENT PAUL O'NEILL, in his official and individual capacity,<br><br>              Defendants. | **CV-19-10-GF-BMM**<br><br>**ORDER** |

Plaintiffs Ana Suda ("Suda") and Martha Hernandez ("Hernandez") (collectively "Plaintiffs") filed a complaint for damages, declaratory, and injunctive relief against Defendants U.S. Customs and Border Patrol ("CBP"),

1

CBP Commissioner Mark A. Morgan, in his official capacity, CBP Agent Paul O'Neill ("O'Neill"), in his individual and official capacities, and John Does 1-25, in their individual and official capacities. The Complaint stems from an alleged illegal stop when O'Neill detained Suda and Hernandez after hearing them speak Spanish in a convenience store in Havre, Montana. Acting on behalf of the CBP, Morgan, and O'Neill, in their official capacities, the United States moved to dismiss the complaint under Federal Rules of Civil Procedure ("FRCP") 12(b)(1) and 12(b)(6). O'Neill also moved to dismiss under 12(b)(6) in his official capacity.

## Background

The Court takes the background from Plaintiffs' Complaint because this case comes on a motion to dismiss. Havre is a town of less than 10,000 people in northern Montana. (*See* Doc. 1 ¶ 41.) This small town serves as home to a "strong and vibrant Latinx community." (*Id.* ¶ 66.) The Latinx community continues to grow throughout Havre and neighboring towns. (*Id.* ¶ 67.) Members of the Latinx community in Havre speak Spanish as a part of their everyday lives. (*See id.*) The community has a Spanish-language music radio show broadcast on 90.1 FM. (*Id.*) Also, Havre has hosted "various multi-cultural events" at Montana State University-Northern, including Latin dance classes to celebrate National Hispanic Awareness Month. (*Id.* ¶ 32.)

CBP maintains a regional office in Havre. (*Id.* ¶ 72.) Designated as "the Havre Sector," the regional office serves as a base for six stations, including a Havre field office in addition to the regional office, in the surrounding areas. (*Id.*)

CBP agents from the Havre field office have been the subject of at least two previous lawsuits involving the detention of Hispanic people. First, the Ninth Circuit determined that CBP violated the Fourth Amendment when it detained five Latinx men in Havre. (*Id.* ¶ 74.); *see United States v. Manzo-Jurado*, 457 F.3d 928 (9th Cir. 2006). A CBP agent noticed four Hispanic men speaking in Spanish to each other and eventually detained them for that reason, among others. *Manzo-Jurado*, 457 F.3d at 933. As a part of its holding, the Ninth Circuit noted that conversing in Spanish may support reasonable suspicion, but does not give rise to reasonable suspicion on its own "because the same characteristic applies to a sizable portion of individuals lawfully present in this country." *Id.* at 937; (Doc. 1 ¶ 74; *see* Doc. 16 at 15-16 (discussing *Manzo-Jurado*)). Second, CBP agents in the Havre field office allegedly detained and interrogated for over 24 hours a pregnant woman who was legally in the country and offered CBP proof of her legal status. (Doc. 1 ¶ 75); *Rojas-Rosas v. United States*, 18-cv-62-GF-BMM.

Plaintiffs Suda and Hernandez are American citizens who have been living in Havre since 2014 and 2010 respectively. (Doc. 1 ¶¶ 22-23.) Both women speak

3

Spanish fluently and see it was a way to remain connected to their cultures and identities as Latinx-Americans. (*Id.* ¶ 26.) Further both women actively participate in Havre's Latinx community. They assist with various multi-cultural events, like teaching Latin dance classes at an event celebrating National Hispanic Awareness Month at Montana State University-Northern. (*Id.* ¶ 32.)

Suda and Hernandez were at a bar dancing in 2018. (*Id.* ¶¶ 76-77.) Also at the bar, a CBP agent took their photos and texted it to other CBP agents. His text stated, "[t]here are two Mexicans at the bar." (*Id.* ¶ 77.) Plaintiffs state that "[o]n information and belief, the agent would have detained Ms. Suda and Ms. Hernandez or arranged for other agents to do so, but one of the agents receiving the text messages indicated Ms. Suda and Ms. Hernandez were friends with his wife." (*Id.* ¶ 78.) The agent who took their pictures never spoke to either Suda or Hernandez. (*Id.* ¶ 79.)

About three months after the incident at the bar, Suda and Hernandez stopped at a Town Pump convenience store in Havre to purchase groceries. (*Id.* ¶ 35.) While shopping, Suda and Hernandez spoke with each other in Spanish with a "normal and casual" tone. (*Id.* ¶ 36.) O'Neill entered the convenience store while Suda and Hernandez shopped, and he overheard them speaking Spanish. (*Id.* ¶ 37.)

Plaintiffs got in line to buy their groceries. O'Neill got in line behind them. (*Id.* ¶ 38-39.)

Hernandez asked O'Neill in English how he was doing. (*Id.* ¶ 40.) O'Neill responded with a comment about Hernandez's "strong" accent and asked Plaintiffs where they were born. (*Id.* ¶ 43.) Plaintiffs responded with their hometowns. (*Id.* ¶ 45.) O'Neill then asked for their identifications and refused to allow Plaintiffs to pay for their groceries until he had their IDs; Plaintiffs provided O'Neill with valid Montana driver's licenses. (*Id.* ¶ 46-47.)

Plaintiffs began recording O'Neill on their cell phones. (*Id.* ¶ 49.) They asked O'Neill why he asked for their IDs and O'Neill allegedly stated, "Ma'am the reason I asked you for your ID is because I came in here and saw that you guys are speaking Spanish which is very unheard of up here." (*Id.* ¶ 50.) O'Neill went on, "it has to do with you guys speaking Spanish in the store in a state where it's predominantly English speaking." (*Id.* ¶ 51.)

Suda then asked for her ID back from O'Neill. (*Id.* ¶ 54.) O'Neill responded, "I understand." (*Id.* ¶ 55.) O'Neill's supervisor eventually showed up to assist O'Neill. Suda asked the supervisor whether they would have been detained if Plaintiffs had been speaking French. The supervisors said "[n]o, we don't do that." (*Id.* ¶ 61.) O'Neill detained Plaintiffs for around forty minutes. (*Id.* ¶ 62.)

Suda and Hernandez filed a complaint based on this interaction with O'Neill. They brought three counts. First, they allege that this interaction violated their Fourth Amendment rights because "there was no reasonable suspicion or probable cause justifying" their detention. (*Id.* ¶¶ 81-86.) Second, they allege that they were detained in violation of their Equal Protection rights under the Fifth Amendment because they were seized based on their race. (*Id.* ¶¶ 87-92.) Third, they seek "a declaration . . . that race, accent and language cannot create suspicion sufficient to justify seizure and/or detention, except where the seizure is based on a specific and reliable suspect description matching such characteristics." (*Id.* ¶¶ 93-96.) In addition to that declaration under Count III, Plaintiffs seek to enjoin Defendants from stopping individuals "on the basis of race, accent, and/or speaking Spanish, except where the seizure is based on a specific and reliable suspect description matching such characteristics." (*Id.* at 16.) Plaintiffs also seek compensatory and punitive damages. (*Id.* at 17.)

Acting on behalf of all Defendants in their official capacity, the United States moved to dismiss the Complaint under 12(b)(1) and 12(b)(6). (Doc. 18.) The United States first argues that the Court lacked subject matter jurisdiction under 12(b)(1) for any action for damages against the Defendants in their official capacity. (*Id.* at 7-8.) Plaintiffs concede on this ground and the Court dismisses any

claim for damages against Defendants in their official capacity. (*See* Doc. 35 at 6.) This ruling does not apply to Plaintiffs' Federal Tort Claims Act claim, which was not part of Plaintiffs' complaint at the time that the parties had completed their motion to dismiss briefing. (*See* Doc. 49.) The United States next argues that Plaintiffs lack standing to seek both injunctive relief and declaratory relief. (Doc. 18 at 8-17.) Acting in his individual capacity, O'Neill moves to dismiss the case for failure to state a claim against him under 12(b)(6). (Doc. 30.)

All of the Government's arguments either ask this Court to draw no inferences in favor of the Plaintiffs or to draw an inference in favor of the Government. Because this Court can do neither when considering this motion to dismiss, the Government's motion must be denied except for where Plaintiffs have conceded. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (requiring the Court to draw all reasonable inferences in favor of Plaintiffs when considering a motion to dismiss under 12(b)(1)).

## Legal Standard

The Government claims in its remaining arguments that Plaintiffs lack standing under 12(b)(6) to obtain injunctive relief. The Ninth Circuit has at times considered lack of standing under 12(b)(6). The weight of authority treats lack of Article III standing, however, as a 12(b)(1) issue. *Compare Jewell v. Nat'l Sec.*

7

*Agency*, 673 F.3d 902, 907-08 (9th Cir. 2011) (analyzing a motion to dismiss for lack of standing under 12(b)(6)), *and Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 992 (9th Cir. 2012) (same) *with Cetacean Cmty. V. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) ("A suit brought by a plaintiff without Article III standing is not a "case or controversy," and an Article III federal court therefore lacks subject matter jurisdiction over the suit."), *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) ("[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."), *Head v. Wilkie*, 936 F.3d 1007, 1012 n.4 (9th Cir. 2019) (same), *Wilbur v. Locke*, 423 F.3d 1101, 1107 (9th Cir. 2005) (treating Article III standing as a "question[] of subject matter jurisdiction"), *Ervine v. Desert View Reg'l Med. Center Holdings, LLC*, 753 F.3d 862, 867 (9th Cir. 2014), *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1147 (vacating and remanding to district court with instructions to dismiss for lack of subject matter jurisdiction because plaintiffs failed to satisfy Article III standing requirements); *Colwell v. Dep't of Health and Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009) (reviewing a claim for lack of standing under 12(b)(1)), and *Freedom from Religion Found., Inc. v. Weber*, No. CV 12-19, 2012 WL 5931899, at *2, (D. Mont. Nov. 27, 2012) (following *Maya*).

The few cases that treat standing as a 12(b)(6) issue assume this point, but do not address or analyze whether a standing argument properly should be heard under 12(b)(1) or 12(b)(6). Cases like *Maya* actually address, however, whether standing proves properly considered under 12(b)(6) and 12(b)(1). *See Maya*, 658 F.3d at 1067-68. Those cases all treat standing as a 12(b)(1) issue, and so will this Court.

Defendants can bring a Rule 12(b)(1) defense in two separate ways. Defendants can make a "factual" attack that contests the truth of plaintiff's factual allegations. *See Leite*, 749 F.3d at 1121. Alternatively, defendants can make a "facial" attack that contests whether plaintiff's allegations prove sufficient on their face to invoke federal jurisdiction. *See id.* The Government makes a facial attack here. Under a facial attack, the Court must accept plaintiff's allegations as true and draw all reasonable inferences in plaintiff's favor. *See id.; Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1156-57 (9th Cir. 2017). General factual allegations of injury that result from a defendant's conduct can satisfy pleading requirements under 12(b)(1). *See Maya*, 658 F.3d at 1068. The Court must "presume[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990); *see Maya*, 658 F.3d at 1068.

**Analysis**

*Plaintiffs show standing to seek injunctive relief*

A plaintiff must demonstrate standing for each type of relief sought. Article III standing typically requires three elements—injury-in-fact, traceability, and redressability. *See Ervine v. Desert View Reg'l Med. Center Holdings, LLC*, 753 F.3d 862, 867 (9th Cir. 2014). Plaintiffs who seek injunctive relief face an additional Article III requirement. They must show "a sufficient likelihood that [the plaintiff] will be wronged again in a similar way." *Fortyune v. Am. Multi-Cinema, Inc.* 364 F.3d 1075, 1081 (9th Cir. 2004) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983)). The sufficient likelihood amounts to a showing of a "real and immediate threat of repeated injury." *Ervine*, 753 F.3d at 867 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).

Here at least two related reasons indicate that Plaintiffs have shown a sufficient likelihood of a "real and immediate threat of repeated injury." First, the small-town nature of Havre. Havre is home to a regional and field office for CBP. And with less than 10,000 people, the chance of Suda and Hernandez running into CBP employees stands much higher than the chances the Court in *Lyons* discussed of the plaintiff running into law enforcement. *See Lyons*, 461 U.S. at 108.

Second and relatedly, Suda and Hernandez allege two incidents involving CBP agents that took place within a three-month span involving CBP agents. The recency of the two incidents—both happening in 2018—and close proximity in time to each other—three months apart—prove enough to support the claim that Suda and Hernandez remain under a real and immediate threat of reinjury. Suda and Hernandez have alleged just enough of a "real and immediate threat" of reinjury to survive at the motion to dismiss on the pleadings stage of litigation. *Ervine*, 753 F.3d at 867 (quoting *O'Shea*, 414 U.S. at 496).

The Government claims that the bar incident proves little about Plaintiffs' suffering a likelihood of substantial and immediate irreparable injury. (Doc. 18 at 14-16.) The Government maintains both that the officer did nothing wrong because CBP officers are allowed to consider a person's Hispanic ethnicity and that Plaintiffs' allegations on "information and belief" cannot constitute a fact entitling a party to injunctive relief. As discussed below, these arguments prove unavailing at the motion to dismiss stage.

The Government's argument that the CBP agent did nothing wrong because Hispanic ethnicity represents a valid factor to consider when deciding whether to detain a person undercuts their argument that Plaintiffs' allegation on information and belief cannot be considered. By claiming that the CBP agent did nothing

wrong, the Government implicitly seems to admit that the CBP agent had been considering detaining Suda and Hernandez. And it would make sense that the Government would concede this point. If the agent had not been considering detaining Suda and Hernandez, then why would he send the text message in the first place? Why would he mention Suda and Hernandez's apparent ethnicity? The fact that the CBP considered detaining Suda and Hernandez represents the easiest inference for this Court to draw.

The Court will operate under the assumption that the CBP agent had been considering whether to detain Suda and Hernandez in evaluating the motion to dismiss. The Government's argument that this Court cannot use Suda and Hernandez's allegation on information and belief that the CBP agent would have had Suda and Hernandez detained if not for a text message from another agent proves irrelevant at this point. If the Court infers that the CBP agent had been considering detaining Suda and Hernandez, then the Court easily can infer from the factual situation that the CBP agent would have had Plaintiffs detained, but for having received a text message about Suda and Hernandez.

The CBP agent texted other CBP agents about Suda and Hernandez regarding one fact—their ethnicity—and that fact alone cannot give rise to reasonable suspicion. *See Manzo-Jurado*, 457 F.3d at 935. The CBP agent learned

one additional fact about Suda and Hernandez—that they were friends with his co-worker's wife—a fact that has little bearing on whether Suda and Hernandez reside in this country legally. And then the CBP agent took no action related to Suda and Hernandez. It stands as entirely plausible at this stage to infer that the CBP agent would have detained Suda and Hernandez, but for the text from his co-worker. Of course, other inferences could be drawn from this factual situation. At the motion to dismiss stage, however, the Court must draw this inference in favor of Plaintiffs. *See Leite*, 749 F.3d at 1121.

The Government next claims that Suda and Hernandez have failed to allege enough past incidents to give rise to a real and immediate threat of reinjury. The Government relies extensively on *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999), in support of this argument. The plaintiffs there had alleged that they saw border patrol agents "all over the place" as they traveled on roads and highways in Arizona within the vicinity of the international border with Mexico. The plaintiffs alleged, however, that they had been stopped by border patrol agents only once in ten years. *See id.* The Ninth Circuit determined that the plaintiffs had failed to allege a factual record to support a real and immediate threat of reinjury under those circumstances. *See id.*

13

*Hodgers-Durgin* proves distinguishable in two material ways. First, contrary to the plaintiffs in *Hodgers-Durgin*, Suda and Hernandez have not alleged that they have seen CBP agents in Havre all of the time. They instead have identified two incidents with CBP agents. One of those incidents lets us infer that an agent may have detained Suda and Hernandez, but for the intervention of another CBP agent. The other incident remains the subject of this lawsuit. Put another way, Plaintiffs have alleged that CBP agents illegally detained, or would have illegally detained, Plaintiffs every time they have seen Plaintiffs in public. This scenario stands in stark contrast to the events in *Hodgers-Durgin* where plaintiffs encountered CBP agents on countless occasions on the roads and highways in Arizona and yet CBP agents had detained plaintiffs just one time each. *See id.*

Second, *Hodgers-Durgin* involved two defendants who each had one interaction with CBP agents over a ten-year span. *See id.* Suda and Hernandez have alleged two incidents that both occurred within a three-month span in 2018. That two incidents have occurred rather than just one opens up a whole possibility of inferences that were not available in *Hodgers-Durgin*. For example, the Court may infer that something at the Havre regional office, or perhaps within CBP at large, has happened such that CBP officers now feel free to detain people for speaking

14

Spanish, whereas previously that would not be the case. The presence of one stop does not permit that inference so easily.

The presence of two incidents does not strengthen Plaintiffs' case significantly over the case in *Hodgers-Durgin*, but a few considerations counsel in favor of denying the motions to dismiss, nonetheless. The two incidents must be viewed in combination with the small size of Havre. Further, the Ninth Circuit decided *Hodgers-Durgin* under the summary judgment standard. This case thus presents the issue of a real and immediate threat at a stage of litigation—a motion to dismiss—where Plaintiffs face a lower burden than the plaintiffs faced in *Hodgers-Durgin* and Plaintiffs offer a stronger case than those in *Hodgers-Durgin*.

Operating under the assumption that something could have changed recently that cause CBP agents to feel free to detain people for speaking Spanish, the Court declines to afford weight to the Government's contention that Suda and Hernandez have lived in Havre since 2010 and 2014 without incident involving the CBP. The long period of time that Suda and Hernandez lived in Havre without being detained diminishes in relevance operating under this inference.

The Court expresses no opinion as to whether the incidents involving other Latinx people in Havre and CBP have any bearing on this case. (*See* Doc. 18 at 12-

15

14.) The Government's motion must be denied even without considering those events.

*Plaintiffs' Claim for Declaratory Relief is Ripe*

The Government premises its entire argument that Plaintiffs' claim for declaratory relief must be dismissed as unripe for the same reasons that Plaintiffs' other claims must be dismissed for lack of standing. The Court will deny the motion to dismiss the declaratory relief claim for the same reasons it has denied the other parts of the Government's motion.

*Defendant O'Neill's Motion to Dismiss is Denied*

Acting in his personal capacity, O'Neill has also moved to dismiss the counts for declaratory and injunctive relief. (Doc. 30.) Plaintiffs concede that they do not seek any "prospective relief" against O'Neill in his individual capacity. (Doc. 40 at 3.) O'Neill's motion to dismiss is granted as to any claims for prospective relief against O'Neill in his individual capacity.

**ORDER**

Accordingly, **IT IS HEREBY ORDERED** that the motion to dismiss on behalf of Defendants U.S. CBP, CBP Commissioner Mark A. Morgan, in his official capacity, CBP Agent Paul O'Neill, in his official capacity, and John Does 1-25, in their official capacities, (Doc. 17) is **GRANTED**, **IN PART,** and

**DENIED, IN PART.** Any claim for damages against Defendants in their official capacity is dismissed.

Further, the motion to dismiss on behalf of Defendant O'Neill, in his personal capacity, (Doc. 30) is **GRANTED**. Any claim for equitable relief against Defendant O'Neill in his individual capacity is dismissed.

DATED this 26th day of February, 2020.

Brian Morris
United States District Court Judge